[L. A. No. 19774.   In Bank.   Dec. 17, 1946.]

ROY E. MAGGART, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Morris E. Cohn and Laurence M. Cahill for Petitioner.

Pierce Works and Jerold E. Weil for Respondent.

THE COURT.—In 1936, following the review of a disciplinary proceeding before The State Bar, in conformity with the recommendation of the Board of Governors, Roy E. Maggart was disbarred from the practice of law. (*Maggart* v. *State Bar*, 7 Cal.2d 495 [61 P.2d 451].) Six years later he filed with this court a petition for vacation or modification of the order of disbarment. Relief in that form was expressly denied, but the petition was treated as an application for reinstatement and referred to the Board of Governors "for such investigation, report and recommendation as may be deemed appropriate." The Board of Governors, in turn, referred the matter to a special administrative committee. After a hearing, the committee made findings and conclusions adverse to Maggart and recommended that his petition for reinstatement as a member of The State Bar be denied. More particularly, the

committee found that he "has not the high moral qualifications required of a member of the Bar," that he "is not sufficiently rehabilitated to warrant his reinstatement," and that he "is not fit for readmission to the practice of law in this state."

When these findings and recommendation were presented to the Board of Governors, the question arose as to whether Maggart had sworn falsely in an affidavit which described certain land as being "unoccupied" within the meaning of the Valentine Scrip Act (17 Stats. at L. 649). To afford opportunity for a further consideration of the effect of his affidavit, the board rereferred the matter to the committee "for the taking of such additional evidence outlined by the Examiner and such evidence in rebuttal as the petitioner may offer."

Maggart's affidavit was made in support of an application to use certain Valentine scrip in connection with the property, which was stated to be reclaimed submerged land located at Terminal Island. Maggart swore that he was "familiar with both the location and the character of the land referred to in said petition." The facts disclosed by the evidence presented to the committee upon the resubmission are that, when Maggart made the affidavit, there was upon the land a large seven unit steam plant, covering almost 40 acres and visible at a great distance, owned and maintained by Southern California Edison Company. Railroad tracks of the Union Pacific Railroad Company lead to this plant.

Following the presentation of evidence, the committee reaffirmed its previous findings. It also submitted, as a part of its report and conclusions, an opinion in which the law in regard to applications under the Valentine Scrip Act, *supra,* was considered at length. Maggart made a false oath, said the committee, when he swore that the land to which he referred was unoccupied, and it characterized his conduct in making this affidavit as inexcusable. The Board of Governors adopted the findings of the committee and recommended to this court that readmission be denied.

Maggart then filed the present proceeding. He contends that there has been no compliance with this court's order of reference because the Board of Governors did not hear the petition or base its recommendation upon sufficient findings of fact. He also asserts that the board and the committee erred in excluding evidence offered for the purpose of attacking the judgment of disbarment and to show rehabilitation. As to the

committee's conclusions in regard to the affidavit made by him, Maggart claims that mere physical possession of a part of the public domain is not sufficient to give it the status of "occupied" land within the meaning of the statute. Upon the merits of his case generally, he urges that the recommendations and conclusions of The State Bar are contrary to the evidence.

The petitioner's contention that the Board of Governors should have based its recommendation upon more detailed findings of fact is without merit. It is sufficient if such findings enable this court to make an intelligent and fair review of the decision of the board. (*McArthur* v. *State Bar*, 28 Cal.2d 779, 783 [172 P.2d 55].) Similar findings have been upheld (see *McArthur* v. *State Bar, supra; In re Cate,* 207 Cal. 443, 445, 449 [279 P. 131]; *In re Stevens,* 83 Cal.App. 745, 746 [257 P. 218]; *In re Cate,* 77 Cal.App. 495 [247 P. 231]), and the petitioner has not been prejudiced by any lack of particularity in them.

As to the rulings upon the introduction of evidence, in the course of the proceedings before the special administrative committee and the Board of Governors, Maggart endeavored to prove that he "was not guilty of all or some of the grounds upon which he had been disbarred." In particular, he offered a receipt for $75 which, he asserts, shows that this sum was spent in accordance with the direction of his client and, therefore, exonerates him of the charge of embezzlement. Because of the exceedingly short notice of the hearing of the charges resulting in his disbarment, says Maggart, he could not produce the document at that time and it should have been received in the proceeding now under review, not only for the purpose of again determining whether he was guilty of acts justifying disbarment, but also upon the issue of rehabilitation.

An order of disbarment is not final in the sense that a disbarred attorney may never resume the practice of the law. On the contrary, it is well established that such a determination does not preclude the court, upon a proper showing of reformation, from reinstating the offender. (*In re Andreani,* 14 Cal.2d 736, 748 [97 P.2d 456]; *In re Stevens,* 197 Cal. 408, 424 [241 P. 88]; *In re Treadwell,* 114 Cal. 24, 26 [45 P. 993]; see 9 Cal.Jur. 10-Yr.Supp. 471.) "It is not the policy of the law, and is not considered to be in the interest of justice, that an attorney who has been disbarred for misconduct shall never under any circumstances be readmitted to practice." (*In re Nisbet,* 77 Cal.App. 260, 261 [246 P. 120].) After suitable

time for rehabilitation has elapsed, upon the presentation of evidence showing that such a person then has the professional qualifications and good moral character which will make him a trustworthy and honorable member of the bar, his right to practice may be restored.

██ But in the absence of a charge going to the validity of the determination regarding discipline, such as extrinsic fraud, the procedure for that purpose is an application for reinstatement, and not a petition to modify or vacate the judgment of disbarment. (See *Vaughan* v. *State Bar*, 208 Cal. 740, 742 [284 P. 909] ; *In re Stevens, supra*, p. 422; *In re Mash*, 39 Cal.App. 548, 551 [179 P. 897].) ██ The evidence presented in support of such an application must relate to the conduct subsequent to disbarment and where this court has reviewed the record and determined in favor of disbarment or suspension, the evidence taken in the disciplinary proceedings will not be reconsidered. (*In re Andreani, supra,* p. 751; *Vaughan* v. *State Bar, supra,* p. 742; see *Ex parte Tyler,* 107 Cal. 78, 80 [40 P. 33] ; *In re Mash, supra,* p. 551; 9 Cal.Jur. 10-Yr.Supp. 474.) Therefore, the only issues which may now be presented by Maggart concern his activities since his disbarment and his present moral qualifications, ability and learning in the law. Accordingly, the special administrative committee and the Board of Governors correctly limited the scope of the reference to the investigation specified by the order and properly excluded the evidence attacking the judgment of disbarment.

Parenthetically, it may be noted that the record of the disbarment proceeding does not support Maggart's charge concerning lack of time and opportunity to procure and present the receipt. The order to show cause requiring him to appear and answer the charges of unprofessional conduct fixed March 27th as the date of hearing. Upon the written request of Maggart, three continuances were allowed. When on April 17th, the last date fixed, he failed to appear, the matter was ordered submitted upon evidence which had been taken while his counsel was present. On July 22d, Maggart appeared before the Board of Governors and applied for a hearing de novo. The application was denied, but he was allowed to cross-examine the complainant and to produce additional evidence, including his own testimony.

██ In a proceeding for reinstatement ''the burden of

proof is upon the one who seeks, after disbarment, to accomplish a restoration to the ranks of the legal profession, and before the court may grant the petition for reinstatement it must be satisfied and fully convinced by positive evidence that the effort he has made toward rehabilitation of his character has been successful. (*In re Cate,* 77 Cal.App. 495 [247 P. 231] ; *In re Nisbet,* 77 Cal.App. 260, 262 [246 P. 120].) It is only reasonable that the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, in an application for reinstatement, although treated by the court as a proceeding for admission, the proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character.'' (*Kepler* v. *The State Bar,* 216 Cal. 52, 55 [13 P.2d 509] ; see *Wettlin* v. *State Bar,* 24 Cal.2d 862, 869 [151 P.2d 255] ; *In re Gehring,* 22 Cal. 2d 708, 712 [140 P.2d 413].)

■ It is not necessary to affirm the committee's conclusions in regard to Maggart's unfitness to practice law upon the narrow ground of the legal effect of his affidavit. It appears that since his disbarment petitioner has been engaged in a multitude of enterprises, most of them centering in Washington, D. C., where he has spent by far the greater portion of his time. During practically all of this period, however, he has been mainly interested in buying and selling, either for himself or others, Valentine land scrip. This scrip consists of certificates issued by the government entitling the owner to immediate possession of unappropriated public lands not known to be mineral in their nature. Maggart, and those with whom he dealt, seemed to regard these certificates as constituting interests in oil lands, and transactions concerning them were characterized in his petition variously as purchases of ''real estate,'' ''management of investments'' and the like. As a witness, in describing his activities, Maggart displayed a voluble evasiveness coupled with an eagerness to change his testimony to suit the exigencies of the moment. Whatever his cause or motive, the positive misstatements of fact with which the record abounds supplies convincing evidence of his lack of rehabilitation.

The rules of The State Bar require an applicant for reinstatement to show ''the approximate monthly earnings and other income of petitioner, and the sources from which all

such earnings and income were derived for the period of rehabilitation.'' In his petition and his direct testimony he stated that in 1936, from his employment with Hancock Oil Company, he earned $7,500. In 1939, he said, he received $15,000 from the same company for services rendered prior to 1935, including the transfer of his interest in the Southwest Exploration Company. The intervening years, 1937 and 1938, according to Maggart, were given primarily to the business of the Magnor Oil Company, ''which efforts were not lucrative at that time,'' and he borrowed $400 during 1938 which was repaid within 60 days.

He accounted for other income of 1939 as being $10,000 from Western Ship Terminals, Inc., and an additional amount of ''approximately'' $6,000 through the management of investments. His earnings for the following year, 1940, Maggart placed at $7,500 received from Western Ship Terminals, Inc. Employment by Arthur Holliday in 1941 brought petitioner approximately $6,000, and he testified to an additional amount of $12,000 as being profit from real estate during the same year. His average monthly earnings since the judgment of disbarment he placed at a sum in excess of $500, not including the $15,000 paid to him in 1939 by Hancock Oil Company. These amounts, Maggart declared, include all of the money he borrowed or received during the years stated.

After cross-examination, however, Maggart amended his petition to show $2,141.32 earned from the Hancock Oil Company in 1936, instead of $7,500. His 1936 income tax return corresponds with the amended figure. He was also permitted to amend his statement as to his average monthly earnings since the date of disbarment, but the new amount does not appear in the record.

According to petitioner's testimony, in 1935 he was ''broke''; he was also ''broke'' in 1936 when he closed his law office after the disbarment. However, he declared that he paid up most of his bills, which amounted to between $5,000 and $6,000. Yet his income during 1936 was only a little more than $2,000. The next two years were given to promotional work for the Magnor Oil Company, in which he was a partner with another person. This was not a lucrative venture, he told the committee, and he received on account of the work done for it only between two and three thousand dollars. This amount, paid by his partner, was for actual expenses incurred on trips to Sacramento and San Francisco. The partner's

testimony was that he had paid petitioner's expenses, totaling about $500, for this two-year period. When asked by one of the members of the committee how he had lived during 1937 and 1938 with no income, he explained that he then had some of the money paid to him by Hancock Oil Company in 1936, and his traveling expenses to Sacramento and hotel bills had been paid by his partner. Income tax returns for these two years, however, show a net income of $935.62 and $936, respectively. The record does not disclose the source of this income.

Under cross-examination before the committee, Maggart admitted that he did not receive any salary from Western Ship Terminals, Inc. but was paid $10,000 to cover his expenses in doing promotional work for them. He placed his actual expenses as being in excess of the $10,000 received. However, in other testimony he stated that he received no cash from Western Ship, but a 17 per cent interest in the company in lieu of expenses.

The $6,000 income from management of investments which he told the committee he received in 1939 appears to have been merely a paper profit. During that year he purchased land scrip certificates for a total of $17,100 which were sold to Western Ship for $31,111. Petitioner's expenses in connection with the location, purchase and sale of these certificates amounted to $15,350, according to his testimony. Those figures indicate a loss of about thirteen hundred dollars in connection with the transaction, but petitioner testified that since he "was given a seventeen per cent interest in the certificates for finding and for handling this whole deal," he considered he had made a profit of $6,000, considering their market value. Here again there is no showing of the source of income for the payment of $1,300 of expenses incurred over and above the $31,111 selling price.

Petitioner's testimony concerning the $15,000 which he received in 1939 from Hancock Oil Company was as follows: He put $20,000 into Western Ship; part of this sum came out of the $15,000 and the balance, $10,000, was paid to him by Western Ship for expenses. He later testified that he invested no cash in Western Ship; all of the $20,000 represented expenses. Subsequently, he declared that the $15,000 was used to maintain a stock account in New York in 1940, but on the same page of the transcript he repeated his previous statement that he put most of the $15,000 into Western Ship. Other testimony by him was that the amount he invested in Western

Ship was closer to $15,000 than $20,000. Since 1940, he testified, he has paid all of his own expenses in connection with his work for Western Ship and he has not asked for reimbursement.

There are other explanations by Maggart concerning his use of the $15,000 paid to him by Hancock Oil Company. He did not put the greater part of it into Western Ship, he said; the amount which went into that company was the difference between the $31,111 selling price and the $17,100 cost price of the scrip sold to them in 1939. However, he also told the committee that he put practically none of the $15,000 into Western Ship; another statement was that about $5,000 or so came from the $15,000, but none of it was invested in 1939.

The testimony with respect to petitioner's income and its sources for the years 1940, 1941 and in 1942 until the hearing before the committee is also unsatisfactory. Most of his income, he stated, was in payment of "expenses" which, he claims, he actually incurred in the interests of his promotional schemes. In fact, he testified that 80 per cent of his time was spent on such work, and there is no evidence of any other income. His testimony as to the year 1940 shows a total of $11,280 received as reimbursement for expenses incurred, but the record indicates that his actual expenses amounted to $14,756.10. Since the record discloses no earnings during this time, how he met the deficit remains unexplained.

Maggart's explanation of the inconsistencies between the income tax returns and the amounts stated in his petition is that the latter shows all amounts received by him for any purpose, while his income tax returns do not include sums paid in reimbursement for expenses. He contends that the confusion in his testimony is reasonably to be expected; no one, he says, is able consistently to recall with accuracy dates and figures. However, the contradictions and discrepancies which appear in the recital of his business affairs during recent years go far beyond the bounds of forgetfulness or inadvertence and cast considerable doubt upon his integrity. Particularly because the charges upon which he was disbarred involved, to say the least, negligence in regard to financial transactions with a client, his testimony as to his earnings since that order was made is highly significant. Moreover, the statement as to his finances which is included in his verified petition is equally unsatisfactory. Under these circumstances, the petitioner has

failed to make a clear showing of the sources of his income and earnings as required by the rules of The State Bar, and the Board of Governors' findings against reinstatement are amply supported by petitioner's own testimony.

The application for reinstatement is denied.